UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| FALCONCREST AVIATION, L.L.C., a Nevada limited liability corporation, and CRESTON AVIATION, INC., a Florida corporation,<br>　　　　　Plaintiffs,<br><br>v.<br><br>BIZJET INTERNATIONAL SALES AND SUPPORT, INC. an Oklahoma corporation, HIGGINS INTERIORS, INC., an Oklahoma corporation, and WALKER WEATHERS, an individual,<br><br>　　　　　Defendants. | Case No. 03-CV-0577-CVE-SAJ |

**OPINION AND ORDER**

Before the Court are Defendant Bizjet International Sales and Support, Inc.'s Motion for Summary Judgment and Brief in Support (Dkt. # 105) and Plaintiffs' Combined Motion for Partial Summary Judgment on: (1) Real Party in Interest; (2) Bizjet's Duty to Plaintiffs and Breach of Duty; and (3) Higgins Interiors' Duty to Plaintiffs and Breach of Duty, and Incorporated Brief in Support (Dkt. # 106).[1]

---

[1] Currently pending are two motions by plaintiffs (Dkt. ## 205 & 208), which, taken together, constitute a request to strike or, in the alternative, respond to a supplemental statement of material facts filed by defendant (Dkt. # 144 & 207). Defendant filed that supplement as an addition to the lengthy narrative provided in its original motion for summary judgment, which failed to comply with the Local Rules, but otherwise provided the necessary factual background. The Court has reached its summary judgment determination without aid of that supplemental statement of facts, and plaintiffs' motions are, accordingly, denied as moot.

**I.**

Plaintiff Falconcrest Aviation, L.L.C. ("Falconcrest") is the owner of a 1980 Gulfstream Aviation G-III business jet (the "Aircraft"). Plaintiff Creston Aviation, Inc. ("Creston") managed the Aircraft pursuant to a contract with Falconcrest. Creston is owned by Mike O'Brien ("O'Brien"). Falconcrest and Creston are referred to collectively herein as plaintiffs. This case involves claims arising from damage to the Aircraft incurred during an attempted takeoff from the Ardmore Regional Airport on July 20, 2002.

Bizjet International Sales and Support, Inc. ("Bizjet") operates a Federal Aviation Administration ("FAA") approved Gulfstream inspection and maintenance facility in Tulsa, Oklahoma. Prior to the accident on July 20, 2002, plaintiffs hired Bizjet to conduct a pre-purchase evaluation of the Aircraft, perform various repairs, and procure an FAA airworthiness certificate. Included in the work performed by Bizjet was a corrosion inspection of the nose gear. The corrosion inspection entailed removal and reinstallation of the nose wheel steering assembly. At the completion of its work, Bizjet certified that the Aircraft had been inspected and repaired in accordance with FAA regulations and approved it for return to service. Bizjet also arranged for an airworthiness certificate. Plaintiffs hired defendant Walker Weathers ("Weathers") and Fred Cassel ("Cassel")[2] to fly the Aircraft from the Bizjet facility in Tulsa to Ardmore, Oklahoma, where a new interior was to be installed by Higgins Interiors, Inc. ("Higgins Interiors"). During takeoff, Weathers noticed that the Aircraft had a tendency to pull to the right but elected not to abort the flight.

---

[2] Cassel is not a party to this suit.

Upon landing in Ardmore, Weathers and Cassel informed Billy Higgins ("Higgins"), an owner of Higgins Interiors, that the Aircraft pulled "hard" to the right. Pls. Mot. for Partial Summ. J. (Dkt. # 106), Ex. 8, at 60-61. The pilots also reported problems with a fuel gauge and the anti-skid mechanism. Higgins recorded the list of problems, or "squawk list," on a sheet of paper and put in his desk. Higgins verbally reported the problems to Richard Burris ("Burris"), Higgins Interiors Director of Maintenance, who is an FAA licensed aircraft mechanic. Higgins did not give the written notes to Burris. It is also alleged that Cassel noted the problems with the Aircraft and left them on a sheet of paper in the Aircraft. Id. at Ex. 8, at 73. Finally, Higgins and Weathers allege that they verbally informed plaintiffs of the problems noted during the flight from Tulsa to Ardmore.

Over the next month, Higgins Interiors personnel removed the interior of the Aircraft and made application to the FAA for a permit for the Aircraft to depart from Ardmore to Fort Lauderdale, Florida, where the Aircraft was to undergo an upgrade of the avionics system. While the Aircraft was at Higgins Interiors, the air pressure on the right nose wheel tire was checked. The pressure was found to be below the manufacturer's recommended level and was corrected. No maintenance was performed on the nose wheel steering gear between the time of the reassembly at Bizjet and the takeoff of the Aircraft from Ardmore.

In accordance with the agreement between plaintiffs and Higgins Interiors, Burris applied to the FAA for a special flight permit, or "ferry permit," to allow the Aircraft to be flown without its interior from Ardmore to Fort Lauderdale, Florida. The ferry permit required that an FAA licensed mechanic, such as Burris, certify that the Aircraft had been inspected and was safe for flight. On the certification of inspection, Burris affirmed, "[t]his aircraft has been inspected and has

3

been found safe for the intended flight in accordance with special flight permit dated 07-18-2002." Id. at Ex. 9. The ferry permit would allow the Aircraft to be flown without its interior from Ardmore to Fort Lauderdale. Burris stated on the application that the reason for the ferry permit was the removal of the interior and addition of ballast to the Aircraft to comply with weight and balance requirements.

The Aircraft attempted takeoff from Ardmore on July 20, 2002 under the command of Captain Gordon Trobert ("Trobert"). During the attempted takeoff, the Aircraft veered to the right and the right main gear departed the runway. Before Trobert was able to recover control of the Aircraft and bring it to a stop on the runway, the right wing struck several runway marker signs, severely damaging the wing and other portions of the Aircraft. Trobert returned the Aircraft to the Higgins Interiors facility for damage assessment.

Shortly after the incident, Joseph Wehrle ("Wehrle"), a licensed mechanic, and Steve Johnson ("Johnson"), a technical representative employed by Gulfstream, the manufacturer of the Aircraft, inspected the Aircraft. The post-incident inspection of the nose gear by Wehrle and Johnson revealed a misalignment of approximately 15 degrees when the steering tiller was placed in the neutral location. Removal of the capstan revealed that the rotor was misaligned by several splines. When the rotor was correctly indexed, the misalignment of the nose gear to the right was corrected. Bizjet did not have a representative present at this inspection of the Aircraft.

Later, Bizjet also performed an inspection of the Aircraft. Patrick Montgomery ("Montgomery"), the President of Air Safety Investigations, Inc., a field adjusting company for aircraft accidents and Bizjet's insurance investigator, evaluated the Aircraft after the accident in

Ardmore. At least the initial phase of Montgomery's investigation determined that Bizjet failed to properly install and test the capstan and anti-skid harness. Id. at Ex. 20.

Plaintiffs allege breach of contract and negligence by Bizjet; breach of contract, negligence, and negligent bailment by Higgins Interiors; and negligence by Weathers. Bizjet counterclaims for breach of contract and in quantum meruit. Plaintiffs move for summary judgment on Bizjet's counterclaims against plaintiffs, and for partial summary judgment on their claims against Bizjet and Higgins Interiors for negligence. Bizjet moves for summary judgment on both the contract and negligence claims made against it by plaintiffs.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994)

5

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Plaintiffs move for summary judgment on Bizjet's counterclaims against them for breach of contract and in quantum meruit, claiming that Bizjet is not the real party in interest because Bizjet sold its counterclaims to its liability carrier, National Union Fire Insurance Company of Pittsburg, Pennsylvania ("National Union"). Plaintiffs offer evidence that National Union paid Bizjet $210,000 in exchange for assignment of Bizjet's counterclaims against plaintiffs. Pursuant to the assignment, National Union also agreed to pay Bizjet an additional $5,000 if National Union lost the counterclaims or settled prior to losing them, and to pay Bizjet any amount recovered exceeding $210,000. National Union also agreed to withdraw its reservation of rights under the insurance policy pertaining to this litigation.

Under Federal Rule of Civil Procedure 17(a), every action must be prosecuted in the name of the real party in interest:

> Every action shall be prosecuted in the name of the real party in interest. . . . No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Id.

Bizjet argues that plaintiffs waived their real party in interest objection because it was not raised with reasonable promptness. See Richardson v. Edwards, 127 F.3d 97, 99 (D.C. Cir. 1997) (holding a period of over two years does not constitute reasonable promptness for purposes of Rule 17(a)). Although National Union received the assignment of claims in February 2005, plaintiffs did not become aware of the transfer of rights until June 2005. Plaintiffs raised the objection under Rule 17(a) within five days of actual notice of the assignment of claims. Thus, Bizjet's waiver argument is without merit.

Bizjet further argues National Union has ratified the action. The only evidence of such ratification is the assignment itself. However, to date, National Union has not sought substitution in the matter. Where an account, claim or debt has been assigned in full, the assignee is the real party in interest with the right to maintain an action, not the assignor. See Hoeppner Constr. Co., Inc. v. United States ex rel E.L. Magnum, 287 F.2d 108, 111 (10th Cir. 1960). Because dismissal of the claims is a harsh remedy and because Bizjet did retain a pecuniary interest in the counterclaims, the Court orders that Bizjet cause National Union to move to be substituted for Bizjet on the counterclaims no later than November 23, 2005.

**IV.**

Plaintiffs and Bizjet have cross-motions for summary judgment on plaintiffs' claim of negligence against Bizjet. Plaintiff seeks partial summary judgment as to breach of duty; Bizjet seeks summary judgment as to supervening cause.[3] The Court addresses the motions in turn.

The elements of negligence are: a duty owed; a failure to properly exercise or perform that duty; and a proximate causal relationship between the failure to perform the duty and the alleged injuries. Franklin v. Toal, 19 P.3d 834, 837 (Okla. 2000). While the question of negligence is generally one for the jury, the question of negligence is one for the court where only "one inference can reasonably be drawn from the evidence." Id.

**A.**

There is no doubt that Bizjet had a duty to plaintiffs to repair and inspect the Aircraft properly. Bizjet agreed to perform certain repairs, to inspect the Aircraft, and to assure the Aircraft was airworthy. Pls. Mot. for Partial Summ. J. (Dkt. # 106), Ex. 5. That agreement forms the basis of the duty owed by Bizjet.

Plaintiffs argue that there is sufficient evidence to find negligence as matter of law on the part of Bizjet. They claim that the damage to the Aircraft occurred due to the failure of Bizjet personnel to properly reinstall the nose wheel steering assembly. In support of their argument, plaintiffs offer a document titled Completed Investigation Summary, dated November 11, 2002, in which Montgomery concludes that in June 2002 Bizjet failed to properly install the capstan and antiskid harness. Id. at Ex. 19, at 104-105. Plaintiffs present other evidence produced by

---

[3] Plaintiffs do not move for summary judgment as to causation, apportionment of fault, or damages. This is also true with regard to plaintiffs' motion for partial summary judgment on their negligence claim against Higgins Interiors.

Montgomery supporting his belief that Bizjet was at least partially liable for the damages to the Aircraft. Id. at Ex. 19, at 116; Ex. 21.

Plaintiffs also present evidence obtained from AIG Aviation ("AIG"), an agent of Bizjet's insurer.[4] Robert McNabb ("McNabb") is a claims adjustor for AIG. In a November 5, 2002 email report to a reinsurance broker, McNabb describes possible defenses to plaintiffs' claims, but readily acknowledges Bizjet's "originally faulty work on [the] aircraft." Pls.' Supp. Brief in Support of Mot. for Partial Summ. J. ("Supp.") (Dkt. # 210), Ex. 2. In a December 11, 2002 report to underwriters and reinsurers, McNabb states that Bizjet "has admitted some degree of negligence with respect to the completion of their work." Id., Ex. 3. And in a June 11, 2003 email report to a reinsurance broker, McNabb concedes: "[T]he fact that Bizjet did in fact err in the method and procedure of repair cannot be overlooked." Id., Ex. 4. The accident investigation done on behalf of plaintiffs also supports the conclusion that Bizjet was negligent in repairing the Aircraft.

Bizjet, in turn, rejects plaintiffs' claim of poor workmanship and argues that: (1) the nose gear assembly was correctly reinstalled pursuant to the manufacturer's maintenance manual; and (2) the correct reinstallation of the nose gear assembly was confirmed by a nose wheel function test performed by Bizjet and a taxi and run-up which was witnessed by plaintiffs' representative, during which time no problems were observed.

Bizjet offers the testimony of various mechanics who worked on, inspected, and tested the Aircraft. Kenneth Baucum and James Foreman, employees of Bizjet, stated that they assisted in

---

[4]   AIG is a managing general agency related to National Union. AIG administers National Union's policy with Bizjet.

9

performing a nose wheel steering function test(s).[5]  Bizjet's Rsp. to Pls.' Mot. for Summ. J. (Dkt.# 131), Ex. B, at 38; Ex. D. at 37-39.  Bizjet also submits the statement of Pat Drewes that repairs were made in accordance with maintenance manual procedures.  Id., Ex. C.  Finally, Bizjet notes that a representative of plaintiffs observed a nose wheel function test and a taxi and run-up, all performed after the repair at Bizjet's faciltiy, at which time no problems were observed.  Id., Ex. I, at 104-105.

In view of this conflicting evidence relating to the maintenance measures taken by Bizjet employees and whether those measures fulfilled Bizjet's duty to plaintiffs, the Court finds that a genuine issue of material fact exists as to Bizjet's breach of duty (negligence).

**B.**

Bizjet's cross motion for summary judgment on plaintiffs' negligence claim is based on a supervening or intervening cause theory.  A supervening cause is a new, independent, and efficient cause of an injury which was neither anticipated nor reasonably forseeable.  Moran v. City of Del City, 77 P.3d 588, 590 n.1 (Okla. 2003).  It is a legal mechanism that breaks the chain of causation between an original actor and the injury to a plaintiff, and effectively shields the original actor from liability because it renders the original actor's breach of duty incidental or inoperatively remote or one which the original actor could not reasonably have foreseen or anticipated.  Evers v. FSF Overlake Assoc., 77 P.3d 581, 586 (Okla. 2003).  "In other words, if the negligence complained of merely affords an opportunity that makes the injury possible and a subsequent independent act causes that injury, the opportunity is not the proximate cause of an injury."  Akin v. Missouri Pac.

---

[5]  The record is unclear as to the number of nose wheel steering function tests performed by Bizjet. Bizjet's Rsp. to Pls.' Mot. for Summ. J. (Dkt. # 131), Ex. B, at 38.

R.R. Co., 977 P.2d 1040, 1055 (Okla. 1999). Instead, it is a supervening cause that effectively insulates the original actor from liability. Id. at 1055 n.81.

In determining whether an intervening event is a superseding cause sufficient to negate causation, the intervening event must be (1) independent from the original negligent act; (2) adequate in itself to bring about the relevant injury; and (3) reasonably unforeseeable. Id.

Bizjet argues that the individuals who conducted the flight from Tulsa to Ardmore and from Ardmore to Fort Lauderdale did so without the requisite FAA permits, making those flights illegal. The unsanctioned operation of the Aircraft broke the chain of causation, Bizjet claims.

The relevant provision from federal regulations, 14 C.F.R. § 91.7, provides:

Civil aircraft airworthiness.

(a) No person may operate a civil aircraft unless it is in an airworthy condition.
(b) The pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight. The pilot in command shall discontinue the flight when unairworthy mechanical, electrical, or structural conditions occur.

Section 91.213 states that "no person may take off an aircraft with inoperative instruments or equipment installed unless" a Minimum Equipment List ("MEL") is provided. Moreover, certain types of inoperable instruments or equipment may not be listed in a MEL but rather must be listed on the flight permit. However, section 91.213(e) further provides, "[n]otwithstanding any other provision of this section, an aircraft with inoperable instruments or equipment may be operated under a special flight permit issued in accordance with [sections] 21.197 and 21.199 of this chapter." Id.

11

The Aircraft was to be flown to Fort Lauderdale under the sanction of a ferry permit. Burris, of Higgins Interiors, applied for the flight permit pursuant to this section. The ferry permit requried that an FAA licensed mechanic certify that the Aircraft had been inspected and was safe for the intended flight. Paragraph 4 of the ferry permit reads:

> [P]rior to the flight, the aircraft must be inspected by a certificated mechanic or repair station to determine the aircraft is safe for the intended flight. The result of that inspection will be entered in the permanent aircraft records with the following similarly worded statement: 'This aircraft has been inspected and has been found safe for the intended flight in accordance with Special Flight Permit dated 07-18-2002.'

Pls.' Mot. for Summ. J. (Dkt. # 106), Ex. 15. Thus, Trobert appears to have been legally operating the plane in accordance with the FAA regulations despite the lack of the MEL and the failure to list the additional inoperative instruments and equipment on the ferry permit. That Burris neither provided an MEL nor listed the inoperative instruments or equipment on the ferry permit does not negate Trobert's right to rely on Burris' certification for purposes of obtaining the ferry permit. Trobert had no knowledge of the issues on the squawk list given to Higgins Interiors.

Even if the ferry permit were considered technically inaccurate, that had no effect on the incident. Even Bizjet's expert admits this. Id. at Ex. 1, at 116. If the primary act of negligence operates concurrently with the secondary act of negligence "so that damage is a result of both causes action in concert--each act may be regarded as the proximate cause and the wrongdoers will be jointly and severally liable for the plaintiff's compensable harm." Lockhart v. Loosen, 943 P.2d 1074, 1079 (Okla. 1997). It was entirely reasonable and foreseeable for Trobert to fly the plane given that he did not know of any of the reports regarding the Aircraft pulling to the right, id. at Ex. 4, at 31-33, and given that a ferry permit had been obtained for the flight. "Where there is a question as to whether an intervening act is the proximate cause of an injury to the exclusion of a prior

wrongful act alleged to have merely created a condition, the question is ordinarily one of fact for determination by a jury." Metropolitan Paving Co. v. Puckett, 389 F.2d 1, 4 (10th Cir. 1968) (citations omitted). The Court concludes, therefore, that summary judgment on Bizjet's claim of a supervening cause is inappropriate.

## V.

Plaintiffs also move for summary judgment on their negligence claim against Higgins Interiors. Plaintiffs argue that Burris and, thus, Higgins Interiors, negligently certified the Aircraft as airworthy to the FAA and the outbound flight crew. Plaintiffs argue that because Burris had knowledge from the inbound Tulsa flight crew that the plane pulled hard to the right, the certification of the plane for airworthiness constitutes negligence.

On this question, the Court concludes that numerous genuine issues of material fact exist. Higgins, part owner of Higgins Interiors, states that he informed not only Burris, but also the owners[6] of the Aircraft of the squawk report from the inbound crew from Tulsa. It is alleged that Weathers also notified O'Brien, owner of Creston, of the problems he and Cassell noticed on the way to Tulsa. Further, there is evidence that when plaintiffs were notified that the Aircraft was pulling to the right,[7] plaintiffs called Higgins and asked that a mechanic check the pressure on the right tire. Higgins Rsp. to Pls.' Mot. for Summ. J. (Dkt. # 132), Ex. 1, at 120-21.

---

[6] As Higgins Interiors notes, the ferry permit also states, "[o]peration of the aircraft is subject to the approval of the owner." Pls.' Mot. for Summ. J. (Dkt. # 106), Ex. 15.

[7] The parties dispute the precise content of the phone conversation between Weathers and O'Brien.

13

Although, at trial, the question of whether plaintiffs had knowledge of the nose wheel steering assembly issue prior to the Aircraft's departure will bear on causation and contributory negligence, it is relevant at the summary judgment stage as well. The Court cannot determine, as a matter of law, that Higgins Interiors breached its duty to plaintiffs where there is evidence that the scope of Higgins Interiors' duty may have been limited or that Higgins Interiors did, in fact, fulfill its duty to plaintiffs. Another issue is whether Higgins Interiors had the authority to make repairs without a directive from plaintiffs. Indeed, O'Brien testified that he would not expect Higgins Interiors to perform a taxi test on the Aircraft or to perform any maintenance or repairs without authorization by plaintiffs. Id. at Ex. 3, at 261-62.

Accordingly, the Court finds that genuine issues of material fact as to the negligence of Higgins Interiors precludes summary judgment.

## VI.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment filed by defendant Bizjet International Sales and Support, Inc. (Dkt. # 105) and the Motion for Partial Summary Judgment filed by plaintiffs Falconcrest Aviation, L.L.C. and Creston Aviation, Inc. (Dkt. # 106) are hereby **denied**.

**IT IF FURTHER ORDERED** that Bizjet shall cause National Union to move to be substituted for Bizjet on Bizjet's counterclaims of breach of contract and in quantum meruit no later than **November 23, 2005.**

**IT IS FURTHER ORDERED** that plaintiffs' motions to strike or respond to defendant's concise statement of facts to which no genuine issue of material fact exists (Dkt. ## 205 & 208) are hereby **denied as moot**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for a status conference (Dkt. # 217) is hereby **granted**; this matter is set for **status conference on November 28, 2005 at 2:00 p.m.**

**DATED** this 16th day of November, 2005.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT